Filed 7/24/26  Doe v. Adventist Health System/West CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JAMES DOE et al., | B344951 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. 22STCV36304 |
| v. | |
| ADVENTIST HEALTH SYSTEM/ WEST, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Laura A. Seigle, Judge.  Affirmed in part, reversed in part, and remanded.

Caddell & Chapman, Michael A. Caddell, Cynthia B. Chapman, Amy E. Tabor; Ahmad, Zavitsanos & Mensing, Foster C. Johnson, Kelsi White; LippSmith, Graham B. LippSmith, MaryBeth LippSmith and Jaclyn L. Anderson for Plaintiffs and Appellants.

Seyfarth Shaw, Kristine Rinella Argentine and Sierra J. Chinn-Liu for Defendant and Respondent

Plaintiffs—four Does who are or were patients of defendant Adventist Health System/West (Adventist)—brought this putative class action asserting claims against Adventist for, among others, violations of the California Invasion of Privacy Act (CIPA) (Pen. Code, §§ 630 et seq.)[1] and the California Confidentiality of Medical Information Act (CMIA). Plaintiffs alleged Adventist shared (without their knowledge) their—and similarly situated patients'—personal information with third parties through web-based tracking technologies—the Meta Pixel and/or Google Analytics—installed on Adventist's websites, including its public health risk assessment (HRA) website and its password-protected patient portal. The tools allegedly tracked site users' activities, collected their data, and sent the information—including personally identifiable information, the contents of users' communications with Adventist, and protected health information (PHI)—to Facebook (Meta) and Google, who shared the data with advertisers.

Plaintiffs sought to certify a class consisting of Adventist patients with California addresses who—for the period from November 16, 2017 to April 30, 2024—"used the Adventist website or patient portal to exchange communications with Adventist . . . for researching medical conditions or treatments, finding a physician, making an appointment, or submitting a health risk assessment form" (general class), and four subclasses. Only two subclasses are relevant to this appeal: (1) the patient portal subclass, consisting of all class members "who were logged into Adventist['s] . . . patient portal up until May 2023";

---

[1]    Undesignated statutory references are to the Penal Code.

and (2) the HRA form subclass, consisting of all class members "who submitted an online [HRA] form to Adventist."

The trial court denied plaintiffs' motion in its entirety. Plaintiffs appeal from the trial court's denial of class certification of the patient portal and HRA form subclasses only. The trial court concluded, as relevant here, plaintiffs failed to establish: (1) the patient portal class was ascertainable, (2) common issues predominated over individual ones for both subclasses, and (3) the superiority and manageability of a class action. The court also found plaintiffs had "dropped any attempt to certify a class" for violations of CIPA under section 632.

The court primarily reasoned that determining whether the data the tracking technologies sent to third parties contained the "contents" of users' communications (CIPA) or users' "medical information" (CMIA) would require an individual inquiry into the information transmitted for each user. The court also reasoned that plaintiffs had not explained how to ascertain which of the patients who had logged into the patient portal had engaged in activities that resulted in transmission of actionable information. Plaintiffs challenge the rulings, arguing the undisputed record evidence showed the patient portal class was ascertainable; the court misunderstood the record, misapplied the definition of "medical information," ignored plaintiffs' theory of liability, and prematurely determined the merits in finding common issues did not predominate; and they demonstrated the manageability of the two subclasses and superiority of a class action to individual trials. We reverse the court's denial of class certification of the HRA form subclass and partially reverse as to the patient portal subclass.

3

## BACKGROUND

**1.** ***Background on tracking technologies***[2]

A web browser communicates with a website's servers to download and display the website's content on the user's screen. To do so, the web browser sends HTTP (hypertext transfer protocol) requests to download files from the website's servers.[3] The HTTP request "contains an IP address, which [is] an identifier assigned to any Internet-connected device," as well as "a URL, which represents the address of the file that a web browser is requesting from a web server," and the "[u]ser [a]gent," which "identifies the details of the operating system and web browser."  "A URL contains the server's domain name, the path of the file located on the server that is being requested, and a list of query parameters that contain additional information being sent from a web browser to a web server." "Cookies" are "used by web servers to keep track of past interactions with the web browser."  Cookies can store "identifiers" "used to identify a specific user account or a specific device/browser."  "Third-party cookies"—set by a third-party server—"allow cross-site tracking of a user across different websites."  On the other hand, "first-party cookies"—set by the first-party server—"allow same-site tracking of a user on a particular website."

---

[2]     We glean most of this background from the report of plaintiffs' expert Dr. Zubair Shafiq.  Quoted material omits footnote references.

[3]     The first HTTP request sent "is typically for the Hypertext Markup Language (HTML) file."  The HTML file contains the source code or content of a webpage.

4

A "tracking pixel"—such as the Meta Pixel and Google Analytics—is a piece of code or image "that is used to track users' browsing activity on the web." "When a tracking pixel is installed on a website by a first party, it allows a third party (i.e., a domain that is different from the first-party website that a user navigates to) to track a user across different websites where the tracking pixel is installed. Put simply, a tracking pixel allows a third party to tell that a user visited website A at time A, website B at time B, and so on." Tracking pixels "also ghostwrite first-party cookies on the visited website's domain to circumvent third-party cookie blocking."

A tracking pixel collects "two types of data"—"identifiers" and "browsing activity"—"in HTTP requests from a user's web browser to the tracking pixel's web server." "Identifiers" are collected through cookies stored by the web browser, and "the combination of IP address and user agent in the transmission from a user's web browser to the pixel's web server." Identifiers stored in cookies can include "account identifiers"—"that uniquely identify the user visiting the website" akin to a driver's license number—and "device identifiers"—"that uniquely identify the user's device" akin to a vehicle's license plate number. The combination of IP address and user agent (or other browser or device information) "contains sufficiently distinguishing information" that can be "used as a unique identifier," known as "fingerprinting."

A website may "install tracking pixels from third-party companies such as Google and Meta to optimize ad campaigns that they run on Google . . . and Meta." Thus, "a website may install and purposefully configure tracking pixels in its HTML source code to share information about specific actions a user

5

takes on their website with the tracking pixel's server." For example, these tracking technologies can track "events," such as when a "button" is clicked, a form is submitted, or a page is viewed on a website.

Google describes Google Analytics as " 'a platform that collects data from your websites and apps to create reports that provide insights into your business.' " " 'Every time a user visits a webpage, the tracking code will collect pseudonymous information about how that user interacted with the page.' " Google Analytics "uses both first-party and third-party cookies" —that store account and device identifiers—"to track users on and across different websites." It also has a feature that "allows Google to link or associate the data with Google accounts of users who have signed into their Google accounts." Meta describes Meta Pixel (formerly called Facebook Pixel) as "a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram." By default, the Meta Pixel "will track URLs visited, domains visited, and the devices [users] use." The Meta Pixel also uses first- and third-party cookies that store account and device identifiers to track users across different websites. For example, the Meta Pixel— through cookies—stores a user's device identifier and Facebook account identifier and "collects them on the facebook.com domain."

In Adventist's words, these tracking technologies "cause different networks (*i.e.*, the Adventist Health server and Google/ Meta servers) to communicate with each other, causing certain

6

categories of data to be transmitted to Google/Meta." The " 'baseline data' " shared consists of first-party cookie identifiers, URLs, IP addresses—whether complete or partially masked—and user agent data.

## 2.   *Adventist's use of tracking technologies*

Adventist is a nonprofit, faith-based healthcare system serving communities on the west coast and Hawaii. Between 2017 and 2024, Adventist installed the Meta Pixel and/or Google Analytics on its websites, including its public-facing website at adventisthealth.org, its patient portal at myadventisthealth.org, and its public HRA website at adventisthealthhra.org.

Adventist placed advertisements on Facebook and other digital platforms, encouraging potential patients to click on a link where they could, for example, fill out an HRA form. The ad links also could lead users to Adventist's website or an ad campaign landing page where they could, for example, request an appointment, attend a webinar, or, again, fill out an HRA form. Adventist used the tracking technologies in connection with its online marketing efforts "to understand how many users [we]re clicking on" a particular "ad and getting to [Adventist's] site so that [Adventist could] optimize the best performing ads." In other words, the tracking pixels enabled Adventist to determine if an ad campaign was resulting in "conversions"— users interacting with the website through pageviews, clicks, form submissions (including HRAs), downloads, etc. Adventist installed Google Analytics on its patient portal to gain "valuable insight," rather than for marketing purposes, however.

### a.   *The patient portal*

The patient portal—hosted by Adventist's business associate, Cerner—is a password-protected website where, among

7

other things, Adventist patients can access information from their electronic health record, including test results; exchange messages with healthcare providers; review treatment information; schedule appointments; and pay bills. Users can navigate directly to the patient portal login from their browser or access it from within the main Adventist website through the "Patient Login" button. Adventist installed only Google Analytics on the patient portal, not the Meta Pixel.

Google Analytics normally shares information about "events" such as, "page views, scrolls, outbound clicks, site search, form interactions, video engagement, [and] file downloads." Adventist was unaware of any modification made to the type of data Google Analytics collected and transmitted within the patient portal.[4] However, Cerner took security measures within the patient portal to "configure[ ] [Google Analytics] to anonymize the IP address[es]" it stored—by "truncat[ing] the last octet of the IP address"—and "to obfuscate [portions of] URLs that were provided when a user browses" the website. To obfuscate the URLs, Cerner used a pattern recognition software that scanned individual URLs and, if the URL "matched a pattern that included an identifier or reference to potential PHI," that portion of the URL was removed or replaced with a generic term. For example, if a URL included a personal or document identification number, Cerner's software replaced it with "PERSON_ID" or "DOCUMENT_ID." Cerner also " 'removed the "query parameter" portion of a URL,

---

[4] Discovery Shafiq reviewed showed Google Analytics was tracking information inside the patient portal about "Logins," "Pageviews," "Health Record – Results," "Download/Transmit," "Messages," and others.

if present, which reflects searches or other information input by the user' " on the web page.[5]

In May 2023, Cerner removed Google Analytics.

b.     *HRA website*

Beginning in 2019 or 2020, Adventist partnered with HealthAware to provide HRAs "through the *adventisthealth hra.org* website to the public as a marketing tool to identify and reach people who may be at an increased risk for certain health conditions and who would benefit from a medical evaluation related" to the condition.  HRAs could be accessed directly through the "main website," through "a specific subpage of the main website," or by clicking on an advertisement "on a third-party website such as Facebook or Google"; they generally were accessed through ads.  When individuals filled out an HRA form and clicked the link to submit it, they were told if they were at "low risk," "moderate risk," or "high risk" for the health condition assessed.

Records of the individuals who completed an HRA—including identifying information the user provided (e.g., name, date of birth, contact information), which HRA they took

---

[5]     The URL "query string" includes "search terms" input by the user.  For example, in the URL "https://www.adventisthealth. org/site-search/?C=pregnancy" the query string (after the "?") shows a search was done at the Adventist website for information about pregnancy.  The following URL has a "path" but no query string:  "https://www.adventisthealth.org/services/cancer-oncology."  The "path" is "services/cancer-oncology" indicating the user viewed information about cancer-oncology under "services." (See *In re Meta Pixel Healthcare Litigation* (N.D.Cal. 2022) 647 F.Supp.3d 778, 795–796 and fn. 10 (*Meta Pixel*) [examples of a URL path and query string].)

9

and when, the risk level assigned, whether they wished to be contacted, and the lead source (how they came to the HRA website)—were stored in Adventist's "Salesforce Customer Relationship Management" (CRM) system.  The tracking pixels installed on the website shared with Google and Meta that an HRA form had been submitted.

### 3.    *Plaintiffs' class action lawsuit*

Plaintiffs are current or former Adventist patients who interacted with Adventist's websites, including the patient portal. Plaintiffs sued Adventist, as individuals and on behalf of a putative statewide class of Adventist patients or prospective patients who "exchanged communications" at one of Adventist's websites between November 2017 and 2024.[6]  Plaintiffs alleged Adventist installed tracking technologies throughout its public websites and patient portal that acted as "listening and recording device[s]" permitting Meta[7] and Google to "eavesdrop[ ]" on their and purported class members' communications with Adventist— their healthcare provider.  Through these tracking technologies, Adventist allegedly disclosed plaintiffs' personally identifiable information and PHI—without their consent—to Meta and Google.  Plaintiffs alleged the tracking technologies transmitted Adventist website users' IP addresses, URLs generated from users' searches and logins, and users' personal data input on the websites.  The information shared with Meta and Google allegedly included, among other things, plaintiffs' and proposed class members' status as Adventist patients, their medical

---

[6]      Plaintiffs filed the operative third amended complaint (TAC) on June 25, 2024.

[7]      Meta owns Facebook.

10

providers, their actual or potential medical conditions and treatments, and their "personal identities."

Plaintiffs alleged Meta/Google used the information collected from Adventist's websites to sell targeted advertising services. In return, Adventist received analytics about its websites to optimize its marketing efforts and ad placement, to enhance user experience, and to monitor how many users engaged with its websites. Plaintiffs alleged they visited Adventist's public website and patient portal where they entered medical information, searched for a doctor, searched for information about a medical condition and/or its treatment, filled out an HRA, made appointments, and/or reviewed test results. Plaintiffs then received advertisements on their Facebook pages relating to their medical conditions.

Plaintiffs asserted ten separate causes of action against Adventist, including, among others: one claim for violating CIPA by using a recording device—the tracking technologies—to record confidential communications without plaintiffs' or class members' consent and transmitting that information to others (§ 632, subd. (a)) (§ 632(a)), and by "aid[ing]" third parties in the interception of the "contents" of plaintiffs' and class members' communications with Adventist (§ 631, subd. (a)) (§ 631(a)); three separate claims for violating CMIA by failing to "maintain the confidentiality of users' medical information" (Civ. Code, § 56.06), by negligently failing to "maintain, preserve, and store" plaintiffs' and class members' medical information "in a manner that preserve[d] the confidentiality" of that information (Civ. Code, § 56.101), and by disclosing plaintiffs' and class members' "sensitive medical information" without their consent (Civ. Code, § 56.10); two claims for violating the Unfair Competition Law

11

(Bus. & Prof. Code, § 17200 et seq.) (UCL) based on its violations of CIPA and CMIA; and a claim for invasion of privacy (Cal. Const., art. 1, § 1).

**4.    *Class certification motion, opposition, and reply***

On June 25, 2024, plaintiffs also filed their motion for class certification.  Both sides submitted reports from their experts, various declarations, deposition testimony, and other exhibits.[8]

a.    *Motion*

Plaintiffs proposed the general class—for the period from November 16, 2017 to April 30, 2024—consist of "all Adventist Health *patients* with an address in California who used the Adventist website or patient portal to exchange communications with Adventist Health, *including researching medical conditions or treatments, finding a physician, making an appointment, or submitting a health risk assessment form*."[9]  (Italics added.)

Plaintiffs also moved to certify four subclasses, including, a patient portal subclass consisting of "All Class members who were *registered users* of Adventist Health's patient portal up until March 29, 2024" (italics added), and an HRA form subclass,

---

[8]    Plaintiffs' expert Shafiq's report summarized his testing and analysis as showing Adventist "uniformly shared patient identifiers (e.g., identifiers of accounts or devices used by patients) alongside content information (e.g., page title and URL) with third-party companies such as Google and Meta.  Therefore, any patient who used Adventist Health's website to search for a doctor, make an appointment, or access the patient portal had their identifying information together with sensitive health information shared with third-party companies."

[9]    The proposed general class in the TAC included prospective patients and did not specify the type of communications.

consisting of "All Class members who submitted an online [HRA] form to Adventist Health." (The two others were the online appointment and provider search subclasses.)

There was no dispute over the numerosity of the proposed class and subclasses. Plaintiffs argued the two subclasses at issue on appeal were ascertainable based on records maintained by Adventist's vendors Cerner and HealthAware. Adventist did not dispute this fact.

Plaintiffs argued Adventist's liability depended on common factual and legal questions that predominated over individual ones. For their CIPA claim, plaintiffs argued those included whether: Adventist's tracking pixels acted similarly to a "bugging device" by " 'contemporaneously and invisibly re-direct[ing] the users' communications to third parties' "; "the pixels' workings constitute an interception of a message in transit in violation of CIPA"; class members had " 'a reasonable expectation of privacy' "; and the transmitted information "included the 'contents' of patients' communications with Adventist." For its CMIA claims, plaintiffs argued common issues included whether "Adventist's deliberate decision to deploy the[ ] tracking pixels constituted a 'disclosure' of information" or "negligent storage or maintenance of information"; whether the disclosed information "included information 'regarding a patient's medical history . . . mental or physical condition, or treatment' " and was protected " 'medical information' " because it included " 'individually identifiable information . . . sufficient to allow identification of the individual' "; whether Adventist was authorized to disclose patients' medical information; and whether an unauthorized party " 'viewed or accessed' " the disclosed information.

Plaintiffs argued the factual and legal issues relating to these questions were common to the patient portal subclass and HRA form subclass, as well. Plaintiffs asserted Adventist had admitted Google Analytics was enabled inside the patient portal, and its standard configuration had not been changed. Plaintiffs also asserted Shafiq's investigation revealed that, after a patient submitted an HRA form, the tracking pixels sent Meta and Google a "full-string URL[ ]" including a "unique string of numbers" that would allow anyone to access the HRA report's contents.

Finally, plaintiffs argued that a class action was superior here to allow class members to obtain compensation—through statutory penalties, and to stop Adventist's "illegal disclosures of their sensitive health information."

b.	*Opposition*

Adventist opposed the motion, primarily arguing several individual issues predominated. Among other issues, Adventist argued that, to prove their CIPA and CMIA claims, plaintiffs would have to present evidence of each individual URL the tracking pixels sent to Meta and/or Google to show whether that information constituted the " 'content' " of a communication or "medical information" and was individually identifiable. With respect to the patient portal subclass, Adventist argued individual URLs sent to Google also would have to be examined to see what had been obfuscated or masked. Adventist argued individual inquiry into proposed HRA form subclass members would be required to determine if individuals were patients at the time they submitted the form, whether they filled out the form for others, and whether they accessed the form through an ad on Google or Facebook, which would affect their reasonable

14

expectation of privacy.  Defendants also presented evidence that the Meta Pixel and Google Analytics transmitted URLs from the HRA website differently:  while Google "likely received" a URL that included the name of the HRA, the URL transmitted to Meta said only "hra.adventisthealth.org" or "quiz.adventisthealth.org."

      c.    *Reply*

In their reply—filed after deposing Adventist's expert Emily Cohen—plaintiffs argued Cohen's confirmation that the tracking technologies " 'share[d] at least a baseline of information consisting of first-party cookie identifiers, page view information, including URL's, IP addresses, whether complete or partially masked, and user agent data' " established the "key liability facts are subject to common proof."  Plaintiffs essentially contended this baseline data was evidence providing proof common to the class as to whether the information transmitted was individually identifiable, conveyed PHI or medical information, or constituted "contents."  Because the tracking technologies always conveyed *at least* the baseline data, plaintiffs argued, whether the tracking pixel transmitted additional protected information "over the 'baseline' " "only increase[d] the degree of harm suffered by class members," and was not relevant to Adventist's underlying liability.

Plaintiffs agreed to limit the patient portal subclass to "All Class members who *logged into* Adventist's patient portal up until May 2023."  (Italics added.)  Plaintiffs argued it was "immaterial what access point patients used" to log into the patient portal, "as any transmission to Google from the myadventisthealth.org domain [the patient portal], regardless of access point, indicate[d] that the individual signed into the patient portal."  Plaintiffs also argued that, although the URLs

15

sent from the patient portal were partially redacted, they still contained descriptive "natural language" terms outside of search parameters that revealed "key information about patients' health condition or treatment." Plaintiffs contended that, because the class included "only patients who exchanged health-care-related communications" with Adventist, the court could determine on a class-wide basis "whether the content" of the communications was "PHI/medical information." Plaintiffs also disputed Adventist's contentions that the court could not determine the specific issues affecting the HRA form subclass on a class-wide basis based on Adventist's records and/or proposed class members' self-reporting.

d. *Hearing and trial plan*

Before hearing oral argument on plaintiffs' motion, the court issued a tentative ruling denying class certification. The court heard extensive argument on December 19, 2024. During the hearing—in response to the court's concerns that the class included individuals who interfaced with the Adventist websites for non-health related reasons—plaintiffs' counsel proposed to amend the class definition to include patients who used the Adventist websites to exchange communications "for" (rather than "including") researching medical conditions or treatments, finding a physician, making an appointment, or submitting an HRA. The court permitted plaintiffs to file a trial plan and Adventist to file a response before taking the matter under submission.

Plaintiffs' trial plan confirmed their modifications of the general class and patient portal subclass. Plaintiffs also narrowed the class claims to those under CIPA, "Penal Code §§ 630 et seq."; CMIA, "Civil Code §§ 56.101 & 56.10"; and UCL.

16

**5.     *The court's denial of class certification***

On February 14, 2025, the court issued an 18-page order denying plaintiffs' motion for class certification in its entirety. As relevant to this appeal, the court found plaintiffs failed to establish the patient portal subclass was ascertainable because they didn't explain "how to ascertain which patients logged into the patient portal and engaged in the types of activities that allegedly resulted in 'content' and 'medical information' being transmitted." The court also found plaintiffs did not show how common issues predominated on either its CIPA or CMIA claims for either subclass. The court found that, although plaintiffs established "medical information may have been revealed by some of the URLs" transmitted from the patient portal, other URLs may not have revealed "either 'content' under CIPA or 'medical information' under CMIA." The court also found "[p]laintiffs did not submit evidence that merely logging into the patient portal transmits information in violation of CIPA or CMIA, or that each activity that a logged-in patient can do within the patient portal transmits information in violation of CIPA or CMIA." As for the HRA form subclass, the court found a person-by-person inquiry would be required to determine whether Google and Meta "actually followed the links" they were sent to the completed HRA forms, such as by showing class members received ads for health issues they disclosed in HRA forms. Finally, the court found plaintiffs failed to show the superiority of a class action as they cited no evidence to support their assertion that "few class members have the time and resources to pursue their claims on an individual basis," and did not address the manageability of the individual questions

17

the court had identified.  Plaintiffs filed a timely notice of appeal.[10]

## DISCUSSION

### 1. *Class certification and standard of review*

Section 382 of the Code of Civil Procedure authorizes a lawsuit to proceed as a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court."  "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

The certification question is " ' "essentially a procedural one that does not ask whether an action is legally or factually meritorious," ' " and thus, "resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citation], with the court assuming for purposes of the certification motion that any claims have merit." (*Brinker, supra,* 53 Cal.4th at p. 1023.)  Our Supreme

---

[10]    An order denying class certification is appealable under the " 'death knell' " doctrine.  (See *Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643, 656, fn. 8.)

18

Court has recognized that, when "evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them." (*Id.* at pp. 1023–1024.) However, "[s]uch inquiries are closely circumscribed." (*Id.* at p. 1024.) "[A]ny 'peek' a court takes into the merits at the certification stage must 'be limited to those aspects of the merits that affect the decisions essential' to class certification." (*Ibid.*)

"'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) Therefore, "'[u]nlike the general rule compelling a reviewing court to scrutinize the result below, not the trial court's rationale, we analyze the propriety of an order denying class certification based solely on the lower court's stated reason for the decision.' [Citation.]" (*Leeds v. City of Los Angeles* (2025) 115 Cal.App.5th 537, 545–546 (*Leeds*).)

"'Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal "'even though there may be substantial evidence to support the court's order.'"'" (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 968 (*Noel*); see also *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 537 ["[a] certification decision is reviewed for abuse of discretion, but when the supporting reasoning

19

reveals the court based its decision on erroneous legal assumptions about the relevant questions, that decision cannot stand"]; *Cochran v. Schwan's Home Service, Inc.* (2014) 228 Cal.App.4th 1137, 1143, quoting *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939 (*Knapp*) [" 'A trial court's decision that rests on an error of law is an abuse of discretion.' "].)

**2.     *Ascertainability of the patient portal subclass*[11]**

A class is ascertainable "when it is defined 'in terms of objective characteristics and common transactional facts' that make 'the ultimate identification of class members possible when that identification becomes necessary.' " (*Noel*, *supra*, 7 Cal.5th at p. 980.) "[T]his standard . . . include[es] class definitions that are 'sufficient to allow a member of [the class] to identify himself or herself as having a right to recover based on the [class] description.' " (*Ibid.*)

Plaintiffs defined the patient portal subclass as "All Class members who were logged into Adventist Health's patient portal up until May 2023." Plaintiffs ultimately defined the general class—i.e., all class members—as, "For the period November 16, 2017 to April 30, 2024, all Adventist Health patients with an address in California who used the Adventist website or patient portal to exchange communications with Adventist Health for [1] researching medical conditions or treatments, [2] finding a physician, [3] making an appointment, or [4] submitting a health risk assessment form." The initial class definition, however, encompassed patients "who used the Adventist website or

---

[11]     The court found the HRA form subclass members were ascertainable based on Adventist's and/or its vendor's records.

patient portal to exchange communications with Adventist Health, *including*" the four above activities.  (Italics added.) Plaintiffs' counsel suggested the revised definition during the hearing on plaintiffs' motion and—in plaintiffs' trial plan— proposed the court certify the general class as revised.

Accordingly, as Adventist asserts, the patient portal subclass definition incorporated the revised definition of the general class.  Substituting "[a]ll Class members" with plaintiffs' definition of the general class, the patient portal subclass definition is:  All Adventist patients with an address in California who logged into the patient portal up until May 2023 to exchange communications with Adventist for researching medical conditions or treatments, finding a physician, making an appointment, or submitting a health risk assessment form.

The court found plaintiffs did not establish the members of the general class were ascertainable.  The court noted plaintiffs "propose[d] that [Adventist] generate a list of all California patients and then 'patients could identify themselves as having used the website or patient portal to research medical conditions or treatments, find a physician, make an appointment, or submit a health risk assessment form.' "  Plaintiffs argued patients would "be able to figure out from the class definition whether they are part of the class and they can 'self-report.' " The court found "[i]t [wa]s not so simple," in part because the class definition "d[id] not clearly tell putative class member[s] how to self-report."  The court then concluded the patient portal subclass had "a similar problem."  Plaintiffs had argued patient portal subclass members were ascertainable because Adventist had "information of all registered patient portal users in its records."  The court found "being a registered user of the patient

portal does not mean a patient engaged in activity on the patient portal that resulted in information, let alon[e] 'content' and 'medical information,' being transmitted to third parties." The court continued, "Plaintiffs do not explain how to ascertain which patients logged into the patient portal and engaged in the types of activities that allegedly resulted in 'content' and 'medical information' being transmitted, as discussed below," referring to its predominance analysis.

Plaintiffs argue the record shows the patient portal subclass is ascertainable through Adventist's or its provider Cerner's records. As plaintiffs note, the evidence shows Adventist could create a report of the patient identification numbers (ID) that created a portal account and the number of times the patient ID "accessed the portal." Accordingly, plaintiffs demonstrated patients who logged into the patient portal during the subclass period were readily identifiable.

However, as the court implied[12] and Adventist argues, plaintiffs did not demonstrate how to identify patients who logged into the patient portal and engaged in one of the four enumerated activities. A patient's options within the patient portal were not limited to researching medical conditions or treatments, finding a physician, making an appointment, and submitting an HRA. Within the patient portal, patients also could view lab, radiology, and other results; view their

---

[12] As we noted, the court found the general class definition did "not clearly tell putative class member[s] how to self-report." We can infer the court found the patient portal—which had a "similar problem"—also did not clearly tell members how to self-report, in part, because it necessarily subsumed the definition of the class.

health record; download a document; send or receive messages; pay a bill; and other activities.

Plaintiffs argue Adventist never disputed the patient portal subclass was ascertainable. In opposing plaintiffs' motion—before plaintiffs modified the class definition—Adventist did not dispute that it could identify patients who had logged into the patient portal. But in response to plaintiffs' trial plan, Adventist argued the "revised general class definition creates serious impediments to certification of their Patient Portal Subclass. Specifically, a patient who merely logs in to the patient portal and does nothing else is not a class member." (Boldface omitted.) Adventist specifically noted plaintiffs' revised class definition included "only those Adventist Health patients who used the Adventist Health websites (and the patient portal) for *only* four specific things"—researching medical conditions or treatments, finding a physician, making an appointment, or submitting a HRA form. Adventist asserted that, as a result, "not *all* patient portal users fall within the class; rather, only those who used the patient portal for identified purposes fall within the revised class definition." Adventist argued this definition raised "additional individual questions about," among other things, "what each patient portal user was doing on the patient portal website" and "whether the actions taken using the portal fall within one of these four specific categories."

Plaintiffs argue patients identified as having logged into the patient portal "could easily recall if they had *ever once* used the Patient Portal for any of the purposes for which it was designed." Patients may be able to recall what actions they took within the patient portal, but plaintiffs have not explained how patients could determine—as Adventist notes—if, for example,

23

their messaging a doctor, downloading a health record, or paying a bill counted as "researching medical conditions or treatments," "finding a physician," "making an appointment," or none of those things.

Nevertheless, as the court itself acknowledged, any interactions a patient had within the patient portal—unlike on Adventist's general website—necessarily would have related to the patient's health care. It does not appear that plaintiffs intended to limit the patient portal subclass only to those patients who engaged in one of the four specified activities—especially when, as we discuss below, plaintiffs contend the baseline information transmitted when a patient logged into the patient portal transmitted "contents" and "medical information" to Google. Indeed, plaintiffs' counsel suggested the revision to the general class definition to address the court's stated concerns about "the general website." Counsel explained, "I think there's one word change that could be made in the proposed class definition for the *general website*. [¶] . . . [¶] . . . Strike the word 'including.' " (Italics added.) The court responded, "Oh, replace it with like about: to exchange communications about researching medical, finding a physician, making an appointment. [¶] . . . [¶] . . . So that would eliminate my concern about like you're just going on to find the address." Counsel continued, "Yes, Your Honor, and we acknowledge that that class would require self-identification anyway . . . . So that one change would we think solve the court's concern with respect or at least address the court's concern with respect to the *general website*." (Italics added.)

24

Accordingly, when discussing plaintiffs' proposed revision to the general class definition, both plaintiffs' counsel and the court had patients' interactions with the general website —rather than the authenticated patient portal—in mind. Critically, earlier in the hearing the court had "agree[d] . . . the patient portal is people who were patients who are engaging in the website because of their medical conditions," not "just some person on the website looking around the website for whatever reason."[13]  In any event, the posture of this case has changed. Plaintiffs no longer seek to certify a general class of patients who used the general Adventist website.  For the remaining patient portal and HRA form subclasses, the enumeration of specific health-related activities simply is unnecessary to weed out patients who used the website for non-health-care-related activities.  The patient portal subclass includes only California patients who *logged into* the patient portal, and the HRA form subclass includes only California patients who *submitted* an HRA form.  Neither subclass raises the concerns the court had that led plaintiffs' counsel to revise the class definition.

---

[13]     Plaintiffs' expert Shafiq also stated the class definition was "limited to patients who interacted with Adventist Health's website in specific ways (submitting a health risk assessment, searching for a medical condition, searching for a physician, booking an appointment with a provider, or *logging into the patient portal*) that involve exchanging health-care-related information with Adventist."  (Italics added.)  In other words, Shafiq understood that logging into the patient portal itself was one of the ways in which purported class members could interact with Adventist's websites to exchange health-care-related information.

25

In essence, plaintiffs' appeal has rendered their post-hearing revision to the general class moot.

And as we discussed, Adventist and/or its provider Cerner have records identifying patients who logged into the patient portal during the relevant period. If some small number of patients who logged into the portal never used the portal, or never used it for themselves, " 'those [persons] can be eliminated from the class at that time.' " (*Nicodemus v. Saint Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1213–1214 (*Nicodemus*) [data set of all patients' attorneys' requests for patient records attaching release authorizations that may have included some requests made after litigation began or for nonlitigation reasons (and thus outside the proposed class) was sufficient to demonstrate ascertainability].) Moreover, Adventist did not dispute that the patient portal class was ascertainable *before* plaintiffs revised the general class definition.

As plaintiffs note, the court also found they did "not explain how to ascertain which patients logged into the patient portal and engaged in the types of activities that allegedly resulted in 'content' and 'medical information' being transmitted." Whether Adventist violated CIPA or CMIA by transmitting the contents of patients communications or their medical information are merits questions that plaintiffs were not required to answer to demonstrate ascertainability. In turn, whether Adventist's liability under those statutes is subject to common proof relates to the court's predominance inquiry, which we discuss below. Accordingly, we conclude plaintiffs demonstrated the patient portal subclass members are ascertainable.

26

### 3. *The court's predominance inquiry*

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Brinker, supra,* 53 Cal.4th at p. 1021.) "A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Id.* at pp. 1021–1022; see also *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450 (*Walsh*) ["In examining whether common issues of law or fact predominate, the court must consider the plaintiff's legal theory of liability."].)

" 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) The "pertinent questions" under the predominance inquiry are: "(1) What elements must be proven to establish the defendant's liability, and (2) Are these elements susceptible of common proof?" (*Downey v. Public Storage, Inc.* (2020) 44 Cal.App.5th 1103, 1113 (*Downey*).) Moreover, " '[T]he possibility that a defendant may be able to defeat the showing of an element of a cause of action " 'as to a few individual class members[,] does not transform the common question into a multitude of individual ones.' " [Citation.]' " (*Nicodemus, supra*, 3 Cal.App.5th at p. 1219.)

27

Plaintiffs' trial plan stated it was seeking class certification of their (1) CIPA claim, which alleged in the TAC that Adventist had violated two provisions of CIPA: section 631(a), known as the "wiretapping provision" and section 632(a), known as the "recording provision"—which the court found plaintiffs had abandoned (see *Meta Pixel, supra*, 647 F.Supp.3d at p. 798);[14] (2) CMIA claims, alleging Adventist violated Civil Code sections 56.10 and 56.101; and (3) UCL claims based on Adventist's alleged violations of CIPA and CMIA.[15]

In essence, the trial court found that—although plaintiffs had established the existence of several issues subject to common proof—due to variations in the actual information shared with Google and/or Meta through the URLs and other data transmitted by the pixels, plaintiffs failed to meet their burden to show Adventist's liability under CIPA or CMIA could be determined based on evidence common to all class members. (See *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28 (*Duran*) ["class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment"' on common issues"].) We first state the applicable law and then review the court's predominance analysis as to the two subclasses.

a.    *Applicable law*

The wiretapping provision of CIPA, as relevant here, imposes statutory penalties on anyone "who willfully and without

---

[14]    We discuss that finding at the end of the Discussion section.

[15]    Accordingly, we need not separately address that claim.

the consent of all parties to the communication," "reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section." (§ 631(a).) Plaintiffs alleged Adventist aided and abetted Meta and Google's violation of the " 'eavesdropping' " and "use" clauses of section 631(a). (See *Rodriguez v. Ford Motor Co.* (S.D.Cal. 2024) 722 F.Supp.3d 1104, 1112–1114, 1116, 1122–1224 [to state a claim for "aiding and abetting" under section 631(a), plaintiff must allege the third party " 'violated one of the first three clauses of section 631(a), and that [d]efendant aided, agreed with, employed, or conspired with that person or entity to commit those unlawful acts' "].)

The court's predominance analysis focused on whether plaintiffs had demonstrated common evidence could be used to determine whether the URLs shared with Google and/or Meta included the "contents" of patients' communications with Adventist. CIPA does not define "contents." A similar provision in the federal Wiretap Act, however, broadly defines " 'contents' " to "include[ ] any information concerning the substance, purport, or meaning of that communication." (18 U.S.C. § 2510(8); see *Meta Pixel, supra*, 647 F.Supp.3d at p. 798 [analysis for a violation of CIPA " 'is the same as that under the federal Wiretap Act' "]; 18 U.S.C. § 2511(1)(a)–(e).) According to the Ninth Circuit, the " 'contents' " of an online communication

"refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." (*In re Zynga Privacy Litigation* (9th Cir. 2014) 750 F.3d 1098, 1106–1107 (*Zynga*).) In *Zynga*, the Ninth Circuit explained a URL that included "only basic identification and address information" did not constitute "the contents of a communication," but a URL that contained "a search term or similar communication made by the user" may constitute "contents." (*Id.* at pp. 1108–1109; see *id.* at pp. 1102–1103, 1107 [granting motion to dismiss where alleged information transmitted—user's Facebook ID and address of webpage user was viewing when user clicked link to a gaming application— was not " 'contents' " but record information].)

Since *Zynga*, other federal district courts within California have considered whether URLs shared or intercepted by tracking technologies constitute the "contents" of a communication. In *Meta Pixel, supra*, 647 F.Supp.3d at pp. 785, 795–796, 798 the trial court—in deciding a motion for preliminary injunction— found alleged transmissions of patients' log-in communications with their health care provider MedStar Health System's patient portal "likely constitute[d] 'contents' " under the Wiretap Act and CIPA. Plaintiffs there alleged that, when they "press[ed] the login button" to enter their patient portal, the information was sent to Meta through a transmission that included the "patient's identity in the form of cookies, IP address, and User-Agent identifiers," "[c]ontent of the button ('Log in')," "[c]ontents of the page from which the patient clicked to log in to the patient portal," and "[c]ontent of the page the patient will land as a result of clicking 'Log in' to the patient portal." (*Id.* at p. 785.) The

30

court found the patient portal "log-in buttons" and the descriptive URLs, which included both "the 'path' and the 'query string,' " were " 'contents' " because "they concern[ed] the substance of a communication." (*Id.* at pp. 795–796 [also explaining "contact information provided as part of a sign-up process constitutes 'content' because this information is the subject of the communication"].)

Federal district courts have " 'employ[ed] a contextual "case-specific" analysis hinging on "how much information would be revealed" by the information's tracking and disclosure.' " (*Cousin v. Sharp Healthcare* (S.D.Cal. 2023) 702 F.Supp.3d 967, 976 (*Cousin II*), quoting *Hammerling v. Google, LLC* (N.D.Cal. 2022) 615 F.Supp.3d 1069, 1092–1093.) " 'Generally, customer information such as a person's name, address, and subscriber number or identity is record information, but it may be contents when it is part of the substance of the message conveyed to the recipient. [Citations.] Similarly, URLs are record information when they only reveal a general webpage address and basic identification information, but when they reproduce a person's personal search engine queries, they are contents.' " (*Ibid.* [denying motion to dismiss where alleged data included "personal search queries—such as specialty healthcare providers and treatments for medical conditions—and therefore plausibly conveyed content: their PHI"]; see also *In re Google RTB Consumer Privacy Litigation* (N.D.Cal. 2022) 606 F.Supp.3d 935, 949 (*Google RTB*) [finding redirected electronic communications allegedly comprised of " 'content categories of the site or app,' " " '[content] categories that describe [the] current section of the site or app,' " the " 'URL of the page where the impression will be shown,' " " 'referrer URL that caused navigation to the current

31

page,' " and a " 'list of keywords about [the] site or app,' " among other items, constituted "content"].)

CMIA in turn prohibits a health care provider from disclosing "medical information regarding a patient . . . without first obtaining authorization." (Civ. Code, § 56.10, subd. (a).) CMIA defines "medical information" as "any individually identifiable information . . . regarding a patient's medical history, . . . mental or physical condition, or treatment. 'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the person's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." (Civ. Code, § 56.05, subd. (j)(1), former subd. (j) (2024–2025), former subd. (i) (2022–2023), and former subd. (j) (2014–2021).) The definition of "medical information" "does not encompass demographic or numeric information that does not reveal medical history, diagnosis, or care." (*Eisenhower Medical Center v. Superior Court* (2014) 226 Cal.App.4th 430, 435 (*Eisenhower*).)

      b.    *HRA form subclass*

          i.    The court made a merits determination in implicitly deciding plaintiffs could not establish by common proof that Adventist transmitted the contents of communications or medical information of patients who submitted HRA forms under CIPA or CMIA

As plaintiffs note, in assessing the predominance prong for the HRA form subclass, the court discussed the evidence

32

relating to plaintiffs' CIPA and CMIA claims together. The court noted plaintiffs' motion asserted—citing Shafiq's report—the tracking code Adventist employed on the HRA forms caused Google and Meta to be notified when an HRA form had been completed and transmitted " 'full-string URLs' . . . that 'included a unique string of numbers that would allow anyone . . . to access the HRA reports' contents.' " The court noted the cited portions of Shafiq's report stated Adventist shared information " 'about specific events such as "HRA Report Accessed" ' and URLs such as 'https://quiz.adventisthealth.org/v3/c6c2ecf4-abec-4222-843a-65e83697f7b0/report/a2d7dfd4-c6fe-4c53-8d41-eacf4e4e87a0.' "[16] Shafiq noted "anyone can go" to that URL "to access the contents of the report."

When "clicked" the two example HRA URLs in Shafiq's report indeed link directly to reports that assess the user's risk factors for the specified health condition based on information the user input into the HRA form. (See footnote 16.) The reports thus refer to that user-provided information. For example, the WeightAware report recommended the individual lose weight and indicated, among other things, that the individual had high blood pressure and cholesterol or was taking medication for those conditions, had sleep apnea and asthma, and exercised a moderate amount. Similarly, the HeartAware report accessed from a second link included the individual's age, sex, and weight, and noted the person had cholesterol outside the recommended

---

[16] This link is to a "WeightAware" report—an HRA for weight loss. Shafiq's report also included the following link to a "HeartAware" report—an HRA for cardiovascular risk: https://quiz.adventisthealth.org/v3/64d7e7c0-d719-4d61-be6d-a2a3f50cebbe/report/8f3a968d-1615-4857-a52b-ebde3074886b.

range, had a family history of early cardiovascular disease, and exercised a moderate amount, among other information.

The court found it was "questionable whether the fact that a person filled out an HRA reveals the contents of a patient's communications with [Adventist] or anything about the patient's physical or mental condition or treatment. On the other hand, the actual HRAs likely contain both contents of patients' communications and their medical information." This difference between a URL/event data indicating a patient had submitted an HRA form, and the completed HRA form or results report itself, is the only reasoning the court expressed for finding plaintiffs failed to demonstrate common issues predominated for the HRA form subclass on their CIPA claim.

But plaintiffs alleged that *every* submission of an HRA questionnaire resulted in the transmission of a URL that linked directly to an HRA report. And whether the transmission of those URLs *linking* to completed reports—rather than transmission of the reports themselves—is the transmission of "contents" under CIPA or medical information under CMIA, is a merits question. (See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439–440 (*Linder*) [question of class certification is "essentially a procedural one that does not ask whether an action is legally or factually meritorious"]; see also *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 (*Sav-On*) ["focus in a certification dispute is on what type of questions— common or individual—are likely to arise in the action, rather than on the merits of the case"].) Plaintiffs presented evidence that this merits question could be answered—one way or the other—with common proof. They presented evidence that the tracking technologies were installed on the HRA portion of

34

the Adventist website and where patients filled out HRA forms; the tracking technologies uniformly shared "a baseline of information" that included URLs, along with first-party cookie identifiers, IP addresses, and user agent data; and after a user submitted an HRA form, a URL was generated providing the user with a report of the results.  In other words plaintiffs' evidence allegedly would show that patients who submitted HRA forms would have received a report of their results through a URL link, and the tracking technologies uniformly would have shared that URL link with Google and/or Meta regardless of the specific HRA submitted.  And arguably the results report for any submitted HRA—as in the examples above—likely would contain the "contents" of patients' communications and their medical information.

Adventist nevertheless argues plaintiffs "presented no evidence that links to particular HRA results were uniformly transmitted," and Shafiq's report did not show the tracking pixels actually shared the HRA results URL with Google and/or Meta. Shafiq stated—under penalty of perjury—that his "testing and analysis" showed Adventist installed tracking pixels from Google and Meta on the HRA section of its website, including where the patient fills out the HRA form.  Anne Dinapoli Block—a representative from Adventist's marketing firm BPD—testified Google Tag Manager containers that included tracking pixels for Google and Meta were "on the HRAs."  And Shafiq's report included the two URL examples noted above.

Shafiq also stated he tested how Adventist "installs tracking pixels from third party companies while interacting with the website in the form of assessments, surveys, and quizzes." He filled out three different HRAs and a cancer genetic risk

survey and, after submitting them, received a final report for each that he "could view, print, or email." Shafiq stated his "testing showed Adventist did share the full-string URL on the HRA portion of its website with both Google and Meta." Moreover, Shafiq opined the "tracking pixel source code on Adventist Health's website operates deterministically, meaning it consistently executes in the same manner, always sharing identifiers and content information with third parties such as Google or Meta." Shafiq further explained, "[s]uch code is designed to behave uniformly for all users, meaning it will execute the same way and share identical types of information for every patient accessing Adventist Health's website." He concluded Adventist's website "uniformly installed tracking pixels from third-party companies such as Google and Meta over the class period." And Adventist's expert Cohen testified she was unaware of any instances where the tracking pixels installed on the "various Adventist websites" did not "share at least a baseline of information," including URLs.

Adventist asserts Shafiq's report showed tracking technologies only on "the homepage/disclaimer page for one particular HRA," but the report did not show "Google or Meta tracking pixels being used on an HRA results page." Adventist notes its manager of marketing automation, Crystal Long, "testified that, to the extent they were used at all, tracking pixels would be on the initial disclaimer pages." Long testified it was her "understanding" that there was a pixel on the initial disclaimer page but that pixel did not record if someone completed an assessment, "[s]o the person could have left the [HRA] and never checked the box and never proceeded, but they're thinking that somebody took that HRA because they

36

got to that page." She recalled that issue "led to a discrepancy between the number of people who visited the [HRA] page and the number that actually completed it." She did not testify that pixels were not firing on the pages or events that came up when a person checked the disclaimer box and completed the HRA form, however. Adventist also asserts Shafiq "fail[ed] to show— through DevTools, historical Google Analytics data, or otherwise" —that the HRA results URL was transmitted to a third party.

Whether plaintiffs can prove Adventist in fact transmitted URL links to HRA reports to Google and/or Meta also is a merits question. At this stage, however, plaintiffs had to demonstrate the claim was subject to common proof, not that they likely would prevail on the claim. (*Downey, supra*, 44 Cal.App.5th at p. 1113 [predominance inquiry asks if the elements of the claim are "susceptible of common proof"].) We conclude the evidence plaintiffs presented was sufficient to demonstrate this issue— whether Adventist uniformly shared URL links to patient HRA reports with Google and/or Meta—could be answered through common proof rather than individual inquiry. We offer no opinion as to whether the evidence plaintiffs ultimately produce will be sufficient to prove that is what happened.[17] In any event,

---

[17] Discovery is ongoing. After the certification hearing, in January 2025, the court granted plaintiffs' motion to compel Adventist to produce certain Google Analytic logs it had provided to its expert Cohen, which Shafiq would use for further statistical analysis. At the certification hearing, plaintiffs' counsel noted the pending motion to compel and argued that, with those data logs, Shafiq could "do a probability analysis . . . to identify the likelihood that an individual class member will have transmitted protected health information at least once during the class period."

the court did not deny certification of the HRA form subclass for failing to satisfy the predominance prong on the ground plaintiffs failed to show Adventist—through tracking technologies—uniformly shared URL links to patients' HRA reports with Meta and/or Google.  (See *Leeds, supra*, 115 Cal.App.5th at pp. 545–546 [appellate court analyzes denial of class certification " 'based solely on the lower court's stated reason for the decision' "]; *Knapp, supra*, 195 Cal.App.4th at p. 939 ["We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling."].)

Adventist also contends the court correctly found "there is significant variability within the URLs and event data that are allegedly transferred to Google and/or Meta" with respect to the HRA form subclass.  In its discussion of the predominance prong for plaintiffs' CIPA and CMIA claims *as to the general class*, the court referred to—in addition to " ' "HRA Report Accessed" ' "—other " 'specific events' " and "page URLs" from the HRA website that Shafiq's report stated Adventist tracked and transmitted, such as " ' "HRA Disclaimer Agree," ' " " ' "HRA Email Sign Up," ' " " ' 'patient-assessment-report,' " " 'https://hraadventisthealth.org,' " and " 'https://quiz.adventist health.org.' "  The court noted Shafiq didn't state whether the referenced "events" "contain[ed] patient search terms" and didn't differentiate between URLs and page titles that included "user-inputted search terms" and those that did not.  The court found the noted events "appear[ed] to be records of page views or buttons/links that a patient clicked" and thus were "not 'content.' "  The court also found the noted URLs and events

38

"provide[d] no information on their face about a patient's medical history, mental or physical condition, or treatment."

The proposed HRA form subclass, however, includes only patients who *submitted* HRA forms. The fact that Adventist transmitted different URLs or event data depending on whether a patient visited an HRA page, clicked on an HRA "quiz," or accessed an HRA report after submitting an HRA form thus did not create individualized issues of proof—patients who viewed but did not submit an HRA form or who only visited an HRA page would not be part of the subclass. Only individuals who submitted an HRA form would have received a URL link to the report with the results. And as plaintiffs assert, all patients who submitted an HRA form would have "proceeded through [the] entire workflow" of multiple page view events. Moreover, determining whether the sharing of a URL that links directly to an HRA report can itself constitute the transmission of the "contents" of a communication or of medical information would not require review of each individual URL. Nor did the court conclude the URLs that Adventist shared when patients *submitted* HRA forms were too varied to determine by common proof whether they constituted the contents of a communication or medical information. As we now discuss, the court found proof of plaintiffs' CMIA claim for the HRA form subclass would require individualized inquiry based on an entirely different reason.

ii.     Plaintiffs presented evidence that the question of whether Google and/or Meta viewed or accessed submitted HRA forms and/or reports under the CMIA was subject to common proof

As the court noted, "Liability under CMIA requires a showing 'that the confidential nature of the plaintiff's medical information was breached as a result of the health care provider's negligence' or affirmative conduct." (Quoting *Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 564, 570, disapproved of on another ground in *J.M. v. Illuminate Education, Inc.* (2026) 19 Cal.5th 705, 723 (*J.M.*).) Undoubtedly, the reports generated in response to a patient's submitted HRA form—as we described above—contained information "regarding" that patient's medical history, condition, or treatment. (Civ. Code, § 56.05, subd. (j)(1) [defining "medical information"].) Plaintiffs also presented evidence that the tracking technologies on the Adventist websites transmitted identifiers including—at a minimum—first-party cookie identifiers, IP addresses, and user agent data from which Google and/or Meta could identify the specific user.[18] (*Ibid.* ["medical information" is "any individually identifiable information" regarding a patient's medical history, etc.].) And, as we discussed, plaintiffs presented evidence that whether Adventist transmitted URL links to its patients' HRA reports is subject to common proof.

---

[18]     Adventist argues that whether Adventist transferred "identifying information . . . for any particular user" to Google and/or Meta is a "significant individualized issue." The court's order, however, did not find plaintiffs failed to show common issues predominated on this question. Without getting into too

In essentially finding Adventist's liability under CMIA was not susceptible to class-wide proof for the HRA form subclass, the court noted the "quiz" URL plaintiffs cited from Shafiq's report—"containing a [unique] string of numbers and letters"—"does not, on its face, reveal medical information. Rather[,] it provides access to medication information." In *Vigil v. Muir Medical Group IPA, Inc.* (2022) 84 Cal.App.5th 197, 213 (*Vigil*),[19] the appellate court held "a breach of confidentiality under the CMIA requires a showing that an unauthorized party *viewed* the confidential information." (Italics added.) Thus, an unauthorized party's possession of or access to the confidential information would be insufficient to show a breach. (*Id.* at pp. 217–219.) The court in *Vigil* also agreed "breach of confidentiality under the CMIA is an individualized issue." (*Id.* at p. 219; *id.* at p. 220 [concluding "each class member would have to show that his or her medical information was viewed by an unauthorized party to recover under the CMIA" under Civil

_____

much technical detail, Shafiq explained Google and/or Meta could determine a user's identity through "[d]eterministic matching . . . based on identifiers such as email address, phone number, and device identifiers," or "[p]robabilistic matching (also known as fingerprinting)," which "relies on statistical analysis of multiple signals." Shafiq opined the "IP address, user agent, and device properties from the patient's browser" that Adventist shared through the tracking technologies contained a sufficient amount of data "bits" to enable Google/Meta to "reasonably identi[f]y an individual"—"even when the patients are not account holders" —through "identity services" using deterministic and/or probabilistic matching.

[19]    As we discuss, *Vigil* was disapproved of in *J.M., supra*, 19 Cal.5th at p. 723.

Code §§ 56.36, subd. (b) and 56.101, subd. (a)].)[20]  Following *Vigil,* the court here found plaintiffs would have to show Google and/or Meta actually viewed the contents of the HRAs to show Adventist's disclosure of the link violated CMIA.[21]

After this matter was submitted for decision, our high court rejected the *Vigil* "rule that no breach of confidentiality has occurred until medical information is actually viewed by an unauthorized person." (*J.M.*, *supra*, 19 Cal.5th at p. 721.) The court held "the primary inquiry with regard to breach of confidentiality is whether the information is exposed to a significant risk of unauthorized access or use." (*Id.* at p. 723.) The court disapproved Vigil to the extent it held otherwise.[22] (*Ibid*.)

---

[20]     *Vigil* involved a data breach where a former employee of a medical group, before her employment ended, "downloaded copies of information for over 5,400 patients that included insurance and clinical information." (*Vigil, supra*, 84 Cal.App.5th at pp. 205–206.)  The named plaintiff had argued "the case could be decided on a classwide basis because there was evidence that [the former employee] downloaded, retained, and viewed a patient spreadsheet." (*Id.* at p. 207.)

[21]     As plaintiffs note, whether a third party "actually viewed the information" is not an element under CIPA.  (See § 631(a) [CIPA is violated when a party "reads or attempts to read, or to learn the contents or meaning of any message, report, or communication" in transit]; see also footnote 22.)

[22]     As we discuss, the *J.M.* decision does not affect our disposition.  If plaintiffs' proffered theory of proof would enable a factfinder to determine on a class-wide basis whether Google and/or Meta viewed or accessed the HRA report links—as we conclude it does below—it also would enable a factfinder to

Not having the benefit of *J.M.,* however, on appeal, plaintiffs have argued the trial court ignored their proposed theory of how they commonly could prove "whether third parties viewed or accessed HRA Subclass members' medical information." Plaintiffs assert they will present evidence at trial—through their expert Dr. Jennifer Golbeck's testimony— that Meta and Google "used sophisticated computer algorithms to process and analyze the data received from tracking pixel transmissions." As plaintiffs note, in her report, Golbeck summarized her analysis as showing "that Facebook and Google routinely collect, analyze[ ], and exploit users' data for advertising purposes, including the data of Adventist's patients."[23] As "Golbeck's testimony will apply to the entire Subclass," plaintiffs contend this element "is a common issue supporting predominance." To the extent that this evidence would satisfy an actual "viewing" or "accessing" requirement, it would necessarily demonstrate exposure to a significant risk of unauthorized access.

Adventist argues plaintiffs never argued Meta's and Google's algorithmic processing of data constituted " 'viewing' " of that information for purposes of CMIA. Adventist acknowledges plaintiffs mentioned their algorithm theory

---

determine if the information in the HRA report links was "exposed to a significant risk of unauthorized access or use." (*J.M.*, *supra*, 19 Cal.5th at p. 723.) To the extent *J.M.* raises new issues, however, the parties may raise them in the trial court on remand.

[23] The court denied Adventist's motion to strike Golbeck's report and opinions.

in a footnote but essentially contends that, because a footnote was insufficient to "advance their 'algorithmic processing' theory at . . . trial," plaintiffs forfeited the argument.

We disagree. In their motion, plaintiffs argued that whether Adventist violated CMIA depended on questions common to the class, including whether "the disclosed information was 'viewed or accessed' by an unauthorized party." Plaintiffs provided their support for that statement—as they did for other common questions their motion identified for this cause of action—in a footnote. Plaintiffs asserted their expert Golbeck "will testify that Facebook and Google have sophisticated systems for processing and analyzing the data and building profiles used to serve targeted advertising. [Citing ¶¶ 35–77 of Golbeck's report.] How these algorithms work and whether processing by computer algorithm constitutes being 'viewed or otherwise accessed' for CMIA purposes present common questions." Plaintiffs filed Golbeck's report with their motion as a supporting exhibit. Plaintiffs also cited to *Cousin II* in support of this theory. In that case, the district court denied defendant's motion to dismiss the plaintiffs' CMIA claim where the plaintiffs had "plead[ed] information regarding Meta's business model and how it uses the information for targeted advertising." (*Cousin II, supra*, 702 F.Supp.3d at p. 975.) The court explained "whether the alleged use by Meta of the information, through perhaps algorithms, amounts to viewing or accessing under CMIA is a question the Court cannot answer on Defendant's motion to dismiss. It is sufficiently plausible at this time that Plaintiffs' information was 'viewed or otherwise accessed' as contemplated by CMIA." (*Ibid.*)

44

Adventist relies on *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404. There, the court found a plaintiff was precluded from raising a legal issue on appeal—that the defendant city had failed to comply with a statute—where he had raised that issue "only in a footnote in his opening [trial court] brief" without substantive legal analysis. (*Id.* at p. 419.) *Holden* is inapposite. There, the plaintiff's footnote stated the city had ignored a statutory requirement without quoting the relevant language from the statute or providing any legal analysis that the city was required to comply with the statute and failed to do so. (*Ibid.*) The plaintiff also failed to provide any substantive analysis of the issue in his opening brief on appeal, again referring to a footnote. (*Ibid.*) Here, however, plaintiffs' motion contended up front that common issues existed as to Adventist's liability under CMIA and set forth those common questions in a bullet-pointed list. From our reading of the motion, counsel made a style choice to use footnotes to describe the common evidence plaintiffs would present to answer those questions rather than interrupt the flow of that list. And, unlike the plaintiff in *Holden*, plaintiffs' opening and reply briefs on appeal substantively address their algorithm theory. We find no forfeiture.[24]

The court did not mention plaintiffs' algorithm theory of proof in finding they failed to show common issues predominated. It thus did not determine if this element of plaintiffs' CMIA claim —whether Google and/or Meta viewed or accessed the HRA

---

[24] Moreover, in opposition to plaintiffs' certification motion, Adventist never argued plaintiffs' algorithm theory would not enable a factfinder to answer the viewing/accessing question on a class-wide basis for the HRA form subclass.

report links—could be determined on a class-wide basis under the theory plaintiffs proposed. (See *Brinker, supra*, 53 Cal.4th at p. 1021 [answer to question of predominance "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment' "]; *Walsh, supra*, 148 Cal.App.4th at p. 1450 [court must consider plaintiffs' theory of liability to determine if common issues predominate].) This was error. As plaintiffs argue, the theory they advanced through Golbeck's report was that "Google's and Facebook's sophisticated algorithms automatically processed the transmitted data." Accordingly, "[t]he trial court's 'actual clicks' theory b[ore] no relationship to Plaintiffs' algorithmic processing theory . . . and therefore cannot support denial of certification." They argue "[i]t is a class-wide merits issue whether the algorithmic processing that Plaintiffs will show Facebook and Google performed satisfies this element as 'viewing' or 'accessing.' " (Citing the district court's holding in *Cousin II, supra*, 702 F.Supp.3d at p. 975, stated above.)

We agree and conclude plaintiffs presented sufficient evidence to demonstrate their algorithm theory of proof would enable a factfinder to determine on a class-wide basis whether Google and/or Meta viewed or accessed the HRA report links. In plaintiffs' words, Golbeck's report explained how Google and Facebook process, analyze, and assimilate users' data they receive to provide targeted advertising. We have reviewed Golbeck's report. She explained companies like Meta/Facebook and Google use machine learning systems to analyze all available user data to develop predictive models to develop targeted advertising. "[B]ecause a machine learning system constructs its predictive model from all data made available, all the data

made available is necessarily used by that system, regardless of what degree of predictive weight a resulting model places on any given data point." Golbeck opined "it is reasonable to state that all data available to [a] model in operation is used by that model, and it is not usually feasible (and not part of the usual parlance of those working with machine learning) to discuss the relationship between a particular piece of data and the predictions made by the model."

As we understand their theory, plaintiffs contend they can show Meta's and/or Google's sophisticated data processing systems/computer algorithms, as a matter of course, would have "accessed" or "viewed" the data within the actual HRA reports —i.e., patients' medical information—through the URL links Adventist transmitted. That data then necessarily would have been used in some way by the predictive models those systems created to develop targeted advertising. Such an analysis would show on a class-wide basis whether or not Adventist's alleged transmission of URL links to patients' HRA reports resulted in a breach of the "confidential nature" of patients' medical information. Defendants argued below and on appeal that what Adventist allegedly transmitted was the URL, not the report itself, and the URL does not reveal medical information. But whether a third-party's computer system's assimilation of data—as plaintiffs' expert described—amounts to the viewing or accessing of that data under the CMIA is a merits question common to the HRA form subclass. Accordingly, we conclude plaintiffs met their burden in the trial court to show whether unauthorized parties viewed or accessed HRA form subclass members' medical information can be determined based on common proof.

In summary, we conclude the court's reasoning did not support its finding that plaintiffs did not show common issues predominated on their CIPA and CMIA claims as to the HRA form subclass.

        c.     *The patient portal subclass*

        i.     Plaintiffs demonstrated their CIPA – wiretapping claim was subject to common proof

Plaintiffs' ultimate theory was that the baseline information the tracking pixels uniformly shared whenever patients interacted with an Adventist website—the first-party cookie identifiers, page view information, URLs (whether partially obfuscated or not), IP addresses (whether complete or partially masked), and user agent data—was evidence applicable class-wide to prove plaintiffs' CIPA (and CMIA) claim, demonstrating common issues predominated. Plaintiffs relied on their expert Shafiq's reports to show the question of whether this information included the "contents" of Adventist's patients' communications was subject to common proof. Those reports, which the court examined, included Shafiq's analysis of the data transmitted to Google and/or Meta from *both* Adventist's public websites and the patient portal, however.

Shafiq stated Adventist "shared at least the following types of sensitive information about patient activity . . . alongside the patient identifiers:" "Page URL that includes search terms" and "Page title that includes search terms." Shafiq gave examples of URLs from Adventist's public website that included query strings with search terms such as "pregnancy," "breast . . . cancer," and the name of a provider combined with the search term "mental . . . health" or "radiation . . . oncology." Another page URL example showed a search at "doctors.adventisthealth.org"

48

that included a query string with the search terms "surgical" and "abortion."

The trial court noted those URL examples included search terms. The court also referred to Shafiq's finding that Adventist shared "Page title that includes search terms such as 'surgical abortion – Find a Physician or Provider/Adventist Health' and 'MyAdventistHealth Patient Portal/Adventist Health.' "[25] The court noted the first page title example appeared to contain search terms but the second did not. The court concluded page titles like the example " 'MyAdventistHealth Patient Portal' " "merely identif[ied] the page" and were "not 'a person's personal search engine queries' that [could] be content." (Quoting *Cousin II, supra*, 702 F.Supp.3d at p. 976.) The court further noted Shafiq's report referred to Adventist having tracked and transmitted " 'specific events' "—again, from Adventist's public website—" 'such as "HRA Report Accessed," "Online Scheduling Confirmation," ' " " 'patient-assessment-report,' " " 'Knee Webinar Thank-You,' . . . 'Lodi Ortho Thank-You,' . . . 'Adventist Health All Contact Button Clicks,' [and] 'Heart Webinar Pageview,' " but he did not "say these events contain patient search terms." As we mentioned, the court found they appeared to be "records of page views or buttons/links that a patient clicked" and "[a]s such," were "not 'content.' "

The court noted that although Shafiq gave examples of URLs "containing patients' search terms," his report "define[d] 'content information' as including page titles." "Navigating to

---

[25] The page title "MyAdventistHealth Patient Portal" appears to be the page where a patient can log into the portal, not necessarily the page within the patient portal after the patient has logged in.

a webpage without entering search terms," the court reasoned, "does not transmit 'contents,' even if information about that webpage (i.e., record data) is transmitted." (Citing *Zynga, supra*, 750 F.3d at pp. 1108–1109.) Accordingly, because one patient's transmitted information might contain "search terms" that "could be content," while another patient's transmitted information might consist of a "webpage or event information" that could be merely "record information," the court found plaintiffs failed to show common issues predominated relating to this element of proof.

Plaintiffs do not dispute this reasoning as applied to the variety of transmissions from Adventist's public website with respect to the general class. Plaintiffs contend, however, that the court's reasoning—that their CIPA claim was not susceptible to common proof because some URLs contained patient search terms and others did not—did not apply to the patient portal subclass because no "query strings" were transmitted from the patient portal. In reasoning plaintiffs failed to show common issues predominated for the patient portal subclass, the court noted one example URL transmitted from within the patient portal included the words "/health-record/radiology"[26] revealing— as Adventist's expert confirmed—that the patient had requested

---

[26] The full page URL in the patient portal for this example was "https://patientportal.myadventisthealthportal.org/person/dS7xf9Kt4in8df5/health-record/radiology/15999379949/download." Before sharing the full page URL, Cerner would have substituted the identifying number strings with "PERSON_ID" and "DOCUMENT_ID." One such example is: "/person/PERSON_ID/health-record/radiology/types/common/DOCUMENT_ID/download."

a radiology report. The court noted such a URL may have revealed the patient's medical information—and thus we can infer also arguably conveyed the "contents" of the patient's communication. The court, however, noted other URLs that reflected the "patient's activity in the patient portal caused a 'Download/Transmit' or 'Health Record – Results' event," "may not reveal . . . 'content' under CIPA" (or " 'medical information' under CMIA"). The court reasoned " 'Download/Transmit' and 'Health Record – Results' appear[ed] not to contain patient search terms."[27]

As plaintiffs note, unlike the public website, none of the URLs transmitted from the patient portal included patient search terms because all query strings were removed. Nor would any Page search terms (such as the surgical abortion example above) have been included, as Cerner's security software would have removed any terms revealing health information within search parameters. Accordingly, as no patient portal URLs contained user search terms or query strings, plaintiffs argue there would be no need to examine the individual URLs for search terms to determine if they transmitted "contents," as the court had reasoned was required for the public website. Rather, plaintiffs contend that whether Adventist's uniform transmission of URLs from the portal with path information, "including descriptive natural language terms like 'Health Record – Results'

_____

[27] These descriptive terms reflected the tabs or buttons within the patient portal that logged-in patients could "click." Others included "lab results," "radiology," "medications," "procedures," "health record," "messages," "appointments," "documents," and "view results."

51

and 'Radiology,' " satisfies the "contents" element of CIPA "is a *merits* question, and it is a common one."

First, we do not interpret the court's reference to "events" not containing "search terms" to mean the court mistakenly believed some URLs in the patient portal had "query strings" and some did not, as plaintiffs seem to contend. Rather, the court was comparing the "radiology" example—which showed the patient had downloaded a radiology record through inclusion of the substantive term "radiology"—with the other two examples that generally described the patient's activity—having instigated an unknown "download" or viewed some type of "results" within the patient's health record. Critically, the court did not state the "radiology" example included user search terms while the "download/transmit" example did not. Rather, we understand the court to have reasoned that, without a user search term, specific document accessed, or other similar user communication, the descriptor "download/transmit" likely did not convey the contents of the patient's communications whereas "radiology" might. (Cf. *Cousin II, supra*, 702 F.Supp.3d at pp. 975–976 [alleging data collected included "specialty healthcare providers" and "treatments for medical conditions" was sufficient to show " 'contents of communications' " to state a claim under CIPA].) We do not disagree that the different descriptive terms within the patient portal URLs seem to convey different levels of information—despite uniformly *not* including query strings.

Nevertheless, those descriptive terms—as we noted—denote the activity *choice* the patient made within the patient's personalized portal. Presumably, a URL that included the descriptive term "health record" or "messages" indicated the patient had accessed her electronic health record or sent or read

52

a message to or from a provider, just as the term "radiology" that appeared in the example above showed a patient checked a radiology result. In the context of an authenticated patient portal, therefore, the description of the chosen page visited, or activity performed within the portal, arguably is not "basic identification [or] address information" that constitutes merely "record information." (*Zynga, supra*, 750 F.3d at pp. 1107, 1109.)[28] For purposes of determining whether the URLs transmitted from the patient portal conveyed "contents" under CIPA, it thus would not seem to matter whether the descriptive term assigned to the chosen activity was more specific like "radiology" or more generic like "download," as any term arguably would convey the "purport" of the patient's communications with Adventist—to message a provider, download a health record,

---

[28] For Adventist's public website, in contrast, the URL arguably would need to include specific terms to disclose that the patient was exchanging health-care-related communications with Adventist and not simply browsing the website. For the patient portal subclass, however, the information Adventist allegedly transmitted did not show the patient simply navigated to the patient portal login page, but that the patient actually had logged into the portal and took a specific action. (Compare, e.g., *Zynga, supra*, 750 F.3d at pp. 1108–1109 [address of website visited was not the "contents of a communication"] with *Google RTB, supra*, 606 F.Supp.3d at p. 949 [finding alleged transmission of " 'content categories' " of website, categories that describe current section of the website, and other information, all disclosed "content"].) Again, the court agreed that patients who logged into the patient portal only would be engaging in activities related to their health care with Adventist.

view a test result, etc.[29]  (See 18 U.S.C.§ 2510(8).)  Whether plaintiffs successfully can establish those URLs—despite having generic descriptive terms—satisfy CIPA's contents element is a merits question, however.  (See *Brinker, supra*, 53 Cal.4th at p. 1023 [certification question does not ask whether action is legally or factually meritorious].)

In any event, plaintiffs argue—as they did below—that the baseline information the tracking technologies universally transmitted when a patient logged into the patient portal is common evidence that will show Adventist transmitted the "contents" of the subclass members' communications in violation of CIPA.  They argue that "simply logging into the portal disclosed the individual's status as [Adventist's] patient" and thus transmitted content.  (See *Nienaber v. Overlake Hosp. Medical Center* (W.D.Wash. 2024) 733 F.Supp.3d 1072, 1081 (*Nienaber*) ["transmission of information submitted to a *private patient portal*—such as a user clicking on the 'log in' button on that webpage—reveals patient status"].)  Plaintiffs presented evidence through Shafiq's report that, along with the URL path showing the user logged into the patient portal, the tracking technologies transmitted the "partially masked IP address,

---

[29]    *Griffith v. TikTok, Inc.* (C.D.Cal., Sept. 9, 2024, No. 5:23-cv-00964-SB-E) 2024 WL 4308813, relied on by Adventist, is thus distinguishable.  The alleged CIPA violations there were based on the TikTok pixel having transmitted the contents of purported class members' communications from *various websites*.  (*Id.* at *1–2, 4.)  The viability of plaintiffs' CIPA claims thus would depend on the nature of each website, each plaintiff's activity on the various websites, and how each different website implemented the software.  (*Id.* at *4.)

54

user agent, and cookies containing identifiers," which were sufficient to enable Google to identify the individual patient.[30] Plaintiffs assert that—"[a]t the merits stage"—their expert will use Google Analytics logs—that were produced after class certification briefing had completed—"to show that descriptive, full-string URLs were disclosed to Google uniformly for all" patient portal subclass members. (See footnote 17.)

The court found plaintiffs "did not submit evidence that merely logging into the patient portal transmits information in violation of CIPA or CMIA." This was a premature determination of the merits of plaintiffs' theory of proof, at least for the CIPA claim. (*Sav-On, supra*, 34 Cal.4th at p. 327; *Linder, supra*, 23 Cal.4th at pp. 439–440.) Sharing a URL path along with patient identifiers that indicated a patient had logged into the Adventist patient portal arguably transmitted the "contents" of the patient's communication. Arguably, the "purport" of—or the "intended message conveyed by"—entering login credentials on the patient portal page and hitting the "login" button is to tell Adventist the user is a verified patient who wants to log into his or her personal patient portal. (See *Meta Pixel, supra*, 647 F.Supp.3d at p. 795 [construing "log-in buttons" to patient portal as " 'contents' "].) Because plaintiffs presented evidence showing the tracking technologies transmitted the same baseline information discussed above for all subclass members, we conclude they met their burden to show the contents element of their CIPA claim was subject to common proof. (See *Downey,*

---

[30] Again, the court did not find plaintiffs failed to show common evidence was available to determine whether the information transmitted could enable Google to identify the individual. (See footnote 18.)

*supra*, 44 Cal.App.5th at p. 1113.) As this was the only element the court discussed in its predominance analysis of the CIPA cause of action for the patient portal subclass, the denial of class certification on this ground is unsupported. (See *Leeds, supra*, 115 Cal.App.5th at pp. 545–546; *Knapp, supra*, 195 Cal.App.4th at p. 939.)

> ii.      Substantial evidence supported the court's finding that plaintiffs failed to show their CMIA claim was subject to common proof for the patient portal subclass

We cannot say the same for plaintiffs' CMIA claim. The trial court found plaintiffs failed to show common proof could establish whether the URLs transmitted from the patient portal disclosed plaintiffs' medical information under CMIA based on essentially the same reasons as its analysis of plaintiffs' evidence of "contents" under CIPA. Plaintiffs argue that, because the patient portal was "dedicated solely to communications regarding patients' medical treatment," whether the URLs transmitted from the patient portal disclosed patients' medical information is a common question. They contend the differences in the specificity of the URLs' descriptive terms thus would not require examination of each individual URL because all the descriptive terms—even the most generic ones—arguably would "regard, concern, and relate to the medical treatments that the patients have received or plan to receive from [Adventist]."

Although patients engaged only in health-related activities within the patient portal, we cannot conclude the variation in the descriptive URLs would not raise individual issues for the "medical information" element of CMIA, as we did for the "contents" element of CIPA. While more generic descriptive

56

terms still indicated the choice the patient made within the portal—and thus, whether a patient's choice of activity constituted "contents" could be answered with common evidence—we agree with the trial court that those same descriptive terms did not uniformly convey "medical information."

For purposes of showing Adventist transmitted "medical information" under CMIA, the variations in the descriptive terms used to describe patients' activities within the portal thus raised individual issues. As the trial court found, a URL revealing that a patient downloaded a "radiology" report may have constituted the disclosure of medical information—that a patient underwent an imaging test or procedure arguably discloses information "regarding" the patient's medical history, condition, or treatment. But a URL revealing that a patient "download[ed]" an unspecified document, viewed something in the patient's health record, or generally made an appointment or sent a message—without more—would not seem to convey information regarding the patient's medical history, mental or physical condition, or treatment.[31] (See *Eisenhower, supra*, 226 Cal.App.4th at p. 435

---

[31] This is in contrast to *Frasco v. Flo Health, Inc.* (N.D.Cal. 2025) 349 F.R.D. 557, on which plaintiffs rely. There, a court certified a class of users of a menstruation and ovulation tracker app whose personal information about menstruation, ovulation, pregnancy goals, and the like, allegedly was shared with Google and Meta. (*Id.* at p. 569.) The descriptive terms of the custom events transmitted there, however, all revealed a user's personal health information, such as "PREGNANCY_WEEK_CHOSEN" or entries relating to a user's goals—such as " 'Track my cycle,' " " 'Get Pregnant,' " or " 'Track pregnancy' "—that all new users were required to input. (*Id.* at pp. 572–573.) The naming conventions of the events within the patient portal here

[rejecting plaintiffs' interpretation of CMIA that would mean "release by a health care provider of personal identification would be sufficient whether or not there was a release of *substantive* information regarding that person's medical condition, history, or treatment" (italics added)]; cf., e.g., *Doe v. Regents of University of California* (N.D.Cal. 2023) 672 F.Supp.3d 813, 818–819 [denying motion to dismiss CMIA claim where plaintiff alleged she entered "information relating to her heart issues and high blood pressure" in her patient portal that defendant disclosed to Meta and that she began receiving advertisements on Facebook for high blood pressure medication].)

While we agree that whether or not the descriptive URLs disclosed medical information is a merits determination, plaintiffs did not demonstrate that merits determination is subject to common proof. Moreover, that the baseline information transmitted when patients logged into the patient portal arguably revealed subclass members' patient status does not also translate into class-wide evidence to prove their medical information was disclosed. Plaintiffs correctly note patient status is PHI under HIPAA.[32] (*Meta Pixel, supra*, 647 F.Supp.3d at p. 793; *Nienaber, supra*, 733 F.Supp.3d at p. 1081.) Patient status is not "medical information" protected under

do not universally convey the same type of personal or specific information.

[32] The Health Insurance Portability and Accountability Act (HIPAA) (42 U.S.C. § 1320 et seq.). See 45 C.F.R. § 160.103 (2026) (defining PHI under HIPAA as "individually identifiable health information" that is "[t]ransmitted by electronic media"; "[m]aintained in electronic media"; or "[t]ransmitted or maintained in any other form or medium").

CMIA, however. (*Eisenhower, supra*, 226 Cal.App.4th at pp. 435–436 [fact individual "may have been a patient at a hospital at some time" or was identified as "a patient is not in itself medical information" under CMIA]; see also *id*. at pp. 436–437 [noting "the definition of 'individually identifiable health information' under federal law differs markedly from that in the CMIA"].)

We also reject plaintiffs' contention that the court did not apply CMIA's definition of medical information. In its discussion of whether common issues predominated on the CMIA claim for the general class, the court quoted the definition from the Civil Code. The court noted Shafiq's report's references to " 'sensitive information' " included more than "medical information" as defined by CMIA. The court expressly found that, "[b]ecause Shafiq's analysis aggregate[d] different types of information—such as URLs that may or may not convey medical information, page titles that may or may not include descriptive or generic search terms or no search terms, and page views and events with generic names that may not convey medical information—into the category of 'sensitive information,' his reports do not support Plaintiffs' conclusion of a common question concerning whether the transmissions violate CMIA." The court had no need to repeat CMIA's definitions or the above findings when it analyzed the descriptive terms included in the URLs transmitted from the patient portal and concluded those terms did not universally constitute " 'medical information' under CMIA." Accordingly, we conclude substantial evidence supported the trial court's reasoning that plaintiffs failed to demonstrate common proof was available to determine whether Adventist disclosed the subclass members' "medical information."

### 4.    *The superiority and manageability of the subclasses*

The court also denied plaintiffs' motion for class certification on superiority and manageability grounds.  Courts generally consider four factors in determining if a class action would be superior to individual suits:  (1) the interest of each purported class member in personally controlling his or her own case; (2) any difficulties " 'likely to be encountered in managing a class action' "; (3) the " 'nature and extent of any litigation by individual class members already in progress involving the same controversy' "; and (4) the " 'desirability of consolidating all claims in a single action before a single court.' " (*Basurco v. 21st Century Ins. Co.* (2003) 108 Cal.App.4th 110, 121.)  "In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently." (*Duran, supra,* 59 Cal.4th at pp. 28–29; *id.* at pp. 32–33 [trial court failed to manage individual issues raised by defendant's affirmative defense properly].)

The court found plaintiffs did not show the superiority of a class action because they (1) cited "no evidence" in support of their assertion that "few class members have the time and resources to pursue their claims on an individual basis" and (2) did not "state the value of the individual claims."

In their reply, plaintiffs asserted they were seeking statutory damages under CIPA and CMIA.  At the hearing, plaintiffs' counsel clarified that the CIPA and CMIA claims were worth $2,500 and $5,000 in statutory damages, respectively, for each plaintiff.  For plaintiffs' other claims, counsel stated their damages expert—in other tracking pixel cases—had estimated the value of the disclosed information to be about

"$200 a class member." Plaintiffs' post-hearing trial plan also stated that plaintiffs sought $5,000 in statutory damages under CIPA (Pen. Code, § 637.2), $2,500 in statutory damages under CMIA (Civ. Code, § 56.36), and estimated damages under the UCL "to be in the range of $200."

We aren't sure what other evidence plaintiffs could have presented to demonstrate few Adventist patients would have "the time and resources to pursue their claims on an individual basis." With at most $7,700 (plus attorney fees) at stake, it is hard to imagine how the average person could afford to pursue these claims individually. For example, the cost to hire expert witnesses to develop the technical evidence necessary to prove these claims alone would exceed any one individual's expected recovery.[33] As a class action, however, the alleged damages in the aggregate would consist of millions of dollars.

"Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' " (*Linder, supra*, 23 Cal.4th at p. 435.) That is the case here. Absent a class action, each individual proposed class member—whether the HRA form or patient portal subclass—effectively would be unable to seek redress for Adventist's alleged privacy violations. As plaintiffs argued, a class action is "not only the best, but realistically the only, way to compensate Class members and hold Adventist accountable for" its alleged disclosures of its patients' information to Meta and Google. Moreover, given the cost of litigation would

---

[33] Shafiq was paid $500 per hour, and Golbeck was paid $550 per hour.

61

far exceed any one individual's recovery, it is unlikely individual class members would have an interest in controlling their own cases.  Nor does Adventist contend any of its patients has ongoing litigation against it involving these same claims.  Finally, given the common issues we have discussed, we agree with plaintiffs that "it would be grossly inefficient for the courts to hear the same liability facts in a deluge of individual actions."  Accordingly, we conclude plaintiffs sufficiently demonstrated the superiority of class action treatment for the HRA form and patient portal subclasses.

As for the manageability question, the court primarily was looking at that issue through the lens of the general class.  As to the two relevant subclasses, the court found plaintiffs failed to "address" the manageability of the individual questions that we have concluded plaintiffs established can be determined through common proof.  For the HRA form subclass, the court stated that plaintiffs did not discuss, for example, "whether there is a way to identify the URLs containing links to HRAs that third parties actually clicked on to view the HRAs."  As we discussed, plaintiffs presented a common theory of proof that would not require a showing of " 'actual clicks' " on individual URLs to establish Google and/or Meta viewed or accessed the linked HRA reports under the CMIA.  The issue the court identified thus would not create a manageability problem.  (*Leeds, supra*, 115 Cal.App.5th at pp. 545–546 [appellate court considers only stated reason].)

As for the patient portal subclass, the court stated plaintiffs, for example, did not discuss "whether some kind of statistical analysis could show the percentage of patients' activity in the patient portal that resulted in URLs containing medical

62

information being sent to third parties." The court also noted—again, as an example—plaintiffs' trial plan stated common issues which included " 'Whether the baseline information transmitted by Google Analytics and the Facebook Meta Pixel constitutes "contents" under CIPA,' and 'Whether the baseline data constitutes "medical information" under [CMIA].' " The court noted, however, that—as it had found—"some of that 'baseline data' (such as page view information and URLs) may or may not be 'contents' or 'medical information' depending on whether the data reveals patient's search terms, the descriptive quality of the search terms, and other characteristics. The trial plan does not explain how analyzing the different types of 'baseline data' . . . can be handled to determine which class members had their 'contents' or 'medical information' transmitted to a third party."

As we have discussed, although this may have been an issue for the general class, it is not one for the patient portal subclass. Under plaintiffs' theory of proof, the baseline data transmitted when any patient logged into the patient portal included the contents of the patient's communication with Adventist. As we explained, that some URLs conveyed more specific terms to describe patients' activities within the patient portal would not affect plaintiffs' contention that all patients who logged into the patient portal had the contents of their communications transmitted to a third party. Arguably, then, no statistical analysis would be necessary to analyze the terms in the URLs, as under plaintiffs' theory, they did not raise an issue requiring individual proof. And as plaintiffs failed to demonstrate their CMIA claim was subject to common proof for the patient portal subclass, we need not determine whether

63

plaintiffs could manage individualized issues relating to that claim for that subclass.

In sum, we conclude the record does not support finding the HRA form subclass, and the patient portal subclass for plaintiffs' CIPA claim, raised individual issues that cannot be managed.

5.   ***The trial court did not abuse its discretion in finding plaintiffs forfeited certification of their CIPA – recording claim***

As the trial court noted, plaintiffs' CIPA claim in their TAC alleged Adventist violated section 632(a) when it "used a recording device to record confidential communications . . . and then transmitted such information to others, such as Facebook." The court however, found plaintiffs had "dropped any attempt to certify a class for alleged violations of section 632." In so finding, the court noted "[n]either [p]laintiffs' motion nor reply brief mentions section 632." The court acknowledged plaintiffs' trial plan—filed after the hearing by permission—"list[ed] section 632 issues to be decided in the trial," but found "asserting those issues after the hearing without briefing or citations to the evidence is too late." We agree.

Plaintiffs contend the court erred. They assert their motion's arguments about their CIPA claims "encompass[ed] both [s]ections 631 and 632." They note a key distinction between sections 631 and 632 is that section 632 "requires a showing that the communications were 'confidential.' " They argue their list of common issues for their CIPA claim included "[w]hether Class members had a 'reasonable expectation of privacy.' " They argue that issue was relevant only to their section 632 claim and they discussed it substantively, citing to discussion in *Meta Pixel* that

64

related to a section 632 CIPA claim. (Citing *Meta Pixel, supra,* 647 F.Supp.3d at p. 799.) Plaintiffs also contend Adventist "understood" plaintiffs had addressed section 632 in their motion because Adventist cited a case for the proposition that " '[i]n a case involving alleged violations of CIPA, "individualized inquiries into the reasonableness of each class member's individual *expectation of confidentiality* . . . [we]re unavoidable" and, therefore such claims were "not capable of being resolved on a class-wide basis." ' " (Citing Adventist's citation of *Mendell v. Am. Med. Response, Inc.* (S.D.Cal., Mar. 23, 2021, No. 19-cv-01277-BAS-KSC) 2021 WL 1102423, plaintiffs added italics.)

Plaintiffs bore the burden on their motion for class certification. That burden included providing citation to the law on the claims for which they were seeking certification and substantive discussion of each of the elements. Plaintiffs never mentioned section 632(a) in their moving or reply papers, as the court found. Although they briefly mentioned the issue of a "reasonable expectation of privacy" in their discussion of their CIPA claim—for which they cited only section 631—plaintiffs never set forth all of the elements they would be required to prove under section 632(a). Nor do we find plaintiffs' brief mention of a "reasonable expectation of privacy" constituted a substantive discussion of the issue. Moreover, Adventist cited *Mendell* in discussing the issue of whether class members had a reasonable expectation of privacy "for purposes of an invasion of privacy claim," not a section 632 claim. After all, plaintiffs originally had pursued an invasion of privacy claim against Adventist, alleged as the fifth cause of action in their TAC.

Finally, we do not find plaintiffs' belated citation to section 632 in their trial plan's list of common questions—

or Adventist's response to the trial plan—cures their failure to cite and properly discuss section 632 in their moving and reply papers.[34]  Accordingly, the trial court did not clearly abuse its discretion in not considering plaintiffs' section 632(a) claim for class certification.

---

[34]     Adventist's response to plaintiffs' trial plan noted plaintiffs' plan's proposed common question—" 'Whether Class members' communications with Adventist were confidential' "—was "a specific element of a Section 632 CIPA claim."  Adventist again cited to *Mendell*.  We do not read Adventist's response to plaintiffs' trial plan's mention of an element of a section 632 CIPA claim as somehow agreeing that plaintiffs' motion raised the claim.

# DISPOSITION

We affirm the court's order finding plaintiffs forfeited their section 632(a) claim and denying class certification of their CMIA claims for the patient portal subclass.  We reverse the court's order denying class certification for the HRA form subclass and the surviving claims for the patient portal subclass and remand the matter for further proceedings.

The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, Acting P. J.

We concur:

ADAMS, J.

HANASONO, J.